Grafton,
June, 1899.

NOYES, *Ap't*, v. MARSTON, *Ex'r*.

Husband and wife are competent witnesses for or against each other except as to matters which would lead to a violation of marital confidence.

APPEAL, from the decision of the commissioner upon the testator's estate disallowing the plaintiff's claim. The facts were found by a referee, who, subject to the defendant's exception, admitted the testimony of the plaintiff's husband as to conversations between the plaintiff and the deceased. The executor did not testify. The court ordered judgment for the plaintiff upon the report, and the defendant excepted.

*Smith & Sloane*, for the plaintiff.

*Albert S. Batchellor* and *William H. Mitchell*, for the defendant, on motion for rehearing. Where the language of a statute, in its normal signification, is expressive of a clear and definite legislative intent, that intent is to be taken to be the law, however strong may be the *indicia* of a different intent discoverable elsewhere; and this rule of interpretation, as now understood, is to be applied without regard to consequences, except perhaps in a very extreme case of resulting absurdity or injustice. 2 Aust. Jur. 469; Suth. Stat. Con., ss. 234, 235; *Mattison* v. *Hart*, 14 C. B. 357; *Sturges* v. *Crowninshield*, 4 Wheat. 122; *United States* v. *Hartwell*, 6 Wall. 385; *Jackson* v. *Lewis*, 17 Johns. 475; *McCluskey* v. *Cromwell*, 11 N. Y. 593; *Rosenplaenter* v. *Roessle*, 54 N. Y. 262; *Bradbury* v. *Wagenhorst*, 54 Pa. St. 180; *Tynan* v. *Walker*, 35 Cal. 634.

Even where the court are satisfied that the real intent of the legislature was different from that which the words of the statute import, they cannot cross the line which separates the judicial from the legislative function by declaring the real and not the expressed intent to be the law. It is, in truth, not the will of the legislator that constitutes the law, but the written expression of it, as found in the statute book. *Coe* v. *Lawrence*, 1 E. & B. 516; *Green* v. *Wood*, 7 A. & E. N. S. 178; *Smith* v. *State*, 66 Md. 215; *Kendall* v. *Green*, 67 N. H. 557; *Nettleton* v. *Billings*, 13 N. H. 446.

The instrument to be interpreted, whatever may be its nature, should undoubtedly be read in the light of all the circumstances which may be supposed to have been present to the mind of its author when it was framed. But these circumstances are to be considered, not as evidence bearing upon the subjective intent of the author, but as evidence bearing upon the objective meaning of his language, which alone is the proper object of the inquiry. After the instrument has been read in the full light of all these circumstances, the same essential question recurs, namely, what is the normal meaning of the language, as employed in the situation disclosed?

The statute to be interpreted in the present case is in the following terms: "Husband and wife are competent witnesses for or against each other in all cases civil and criminal, except that neither shall be allowed to testify as to any statement, conversation, letter, or other communication made to the other or to another person, nor as to any matter which in the opinion of the court would lead to a violation of marital confidence." P. S., *c.* 224, *s.* 20.

On its face this language is perfectly clear and definite. It is provided in general terms that husband and wife may be compe-

tent witnesses for or against each other, and an excepting clause is added, composed of two grammatically distinct and correlative members, connected by a negative conjunction,—the first member embracing "any statement, conversation, letter, or other communication made to the other or to another person," while the second member embraces "any matter which in the opinion of the court would lead to a violation of marital confidence." The intention could not well be more unmistakably expressed to include in the exception to the general rule of competency two classes of testimony, contradistinguished and mutually exclusive though belonging to the same general species, as to the first of which classes the exception is absolute, and as to the second of which it is qualified. That this is the normal and natural significance of the words used, in the collocation in which they are used, seems to us too apparent to require illustration or argument. Indeed, the matter is not one susceptible of much illustration or argument. The meaning we have attributed to the language is self-evident. The modes of speech, which have become a part of the nature of every individual employed in this inquiry, point unequivocally to it.

A close analysis is not necessary to conduct a faithful and intelligent interpreter to this result. We venture the assertion that if the section were to be read over for the first time to a hundred intelligent English-speaking individuals, lawyers or laymen, and they were to be asked what it meant, every one of them would say without hesitation that the meaning is as we have stated it.

Do these words take on any different meaning when we read them after putting ourselves as nearly as possible in the point of view occupied by their authors when they were first written? They date substantially from the revision of 1878 (G. L., c. 228, ss. 20, 21), the changes made in the revision of 1891 having been, as is conceded, merely verbal, with a view to condensation and with no purpose to change the law. What, then, was the point of view of the commissioners of 1878 and of the legislature which enacted their revision as the General Laws?

We shall be placing ourselves as nearly as possible in the point of view occupied by the commissioners and the legislature, if we call to mind the history of the prior legislation on the subject and the exact condition in which the law stood at the time of the revision. Speaking in a summary way, it may be said that the commissioners and the legislature must have known that the policy of our legislation had been for some twelve years gradually progressing in the direction of an enlargement of the competency of husband and wife as witnesses for and against each other; that in the statute of 1866, by which the first innovation was made upon the common-law rule, it had been provided that the enlarged com-

petency then conferred should not extend "to the testimony of a
husband and wife for or against each other, as to any statements,
conversations, letters, or other communications, between them, or
between either of them and any third person" (Laws 1866, c.
4268, *s.* 2); that in the General Statutes (enacted in 1867)
further material changes had been made, but that as respects the
testimony of either spouse against the other the proviso just
quoted had been substantially retained, with the addition of a
clause excluding their testimony "as to other matters when it ap-
pears to the court that the examination of either as a witness in
relation thereto would lead to a violation of marital confidence"
(G. S., *c.* 209, *ss.* 20-22); that by section 22, chapter 209, of the
General Statutes, as amended by the act of 1870 (Laws 1870, c.
20), according to the construction placed upon the original and
the amended act in *Clements* v. *Marston,* 52 N. H. 31, the wife
might testify for or against the husband and the husband for or
against the wife in any case, when it appeared to the court that
such testimony would not lead to a violation of marital con-
fidence; and, finally, that the wife had, by the act of 1871, been
made a competent witness for or against her husband in criminal
cases.    Laws 1871, *c.* 38, *s.* 2.

Giving *Clements* v. *Marston* its due effect as interpretative of
section 22, chapter 209, of the General Statutes, as amended
by the act of 1870 (and omitting the provision as to criminal
cases made by the act of 1871 as irrelevant for the present pur-
pose), the law as it stood on the statute book at the time of the
revision of 1878 was virtually as follows: "The wife may testify
for or against the husband or the husband for or against the wife
in any case, when it appears to the court that their examination
as witnesses upon the points to which their testimony is offered
would not lead to such violation of confidence,"—the words
"such violation of confidence" signifying a violation of marital
confidence.

Now when all the light afforded by the history of the prior
legislation on the subject, as thus briefly outlined, has been turned
on section 21, chapter 228, of the General Laws, what different signifi-
cance does the language assume from that which it conveys at first
reading?    Not any, we say.    It appears to be entirely appropriate
language to accomplish just the change in the law which we say it
did accomplish.    Recurrence is had to the old form of expression
(that of the act of 1866 and of the General Statutes), manifestly
for the purpose of restoring *quoad hoc* the old law.    The language
is exactly that which would have been employed by a draughts-
man who wished to alter the then existing statute by making an
absolute exception to the general rule of competency of "any

statement," etc., made by either spouse to the other or to a third person, and a qualified exception to that general rule of all "other matters" which might lead in the opinion of the court to a violation of marital confidence.

The truth is, the history of the legislation on the subject is used by the court, not as an aid in the interpretation of the language of the statute, which is the only way in which it can properly be used, but as evidence bearing directly upon the question of the actual intention of the lawmakers, which is a totally irrelevant question. The court say: "The policy of the legislature has been uniformly to remove restrictions placed upon the competency of witnesses and testimony. . . . The ancient disabilities pertaining to the marriage relation have also been removed from time to time, until now husband and wife stand upon an equality of right in respect to property, torts, and contracts, subject only to minor exceptions in favor of the wife. . . . It would be strange indeed if a legislature should set itself against the strong forces of civilization that have produced such changes, and restore disabilities of this character once removed." Here we have an inference, drawn from the history of the prior legislation on the competency of witnesses and the rights of married women, as to what the legislature which enacted the General Laws might probably have been disposed to do in the matter.

This sort of reasoning might justify the court in departing from the natural and obvious meaning of the language used in the statute, if it went to the extent of showing that there would be involved in attributing to the legislature an intention to use the language in its normal sense an injustice or absurdity, "so monstrous," to use the words of Chief Justice *Marshall*, "that all mankind would, without hesitation, unite in rejecting" such an application of the statute,— as, for instance, if our legislature should enact the sixth, seventh, and eighth commandments with the omission of the negative. But of course there is nothing of that sort here. It is merely a slight change of policy which is involved; and as to that change of policy it is submitted that a lack of appreciation of its real character, and of the reasons which might properly have influenced the lawmakers to adopt it, is developed when they imply, as they do in the extract above quoted, that such action would have been necessarily very eccentric and reprehensible.

There would have been nothing more singular or inexplicable in such a change in the law than there is in any other piece of somewhat reactionary legislation. The old statute had made husband and wife competent witnesses in all cases unless the court could see that their testimony would tend to a violation of marital confidence. The new statute defines certain classes of testimony

peculiarly liable to lead to a violation of marital confidence, and makes the exclusion of such testimony absolute; and then as to other matters it makes it discretionary with the court to admit or reject them, according as their tendency may seem to be toward a violation of marital confidence or not. That there is something to be said in favor of the statute in this new form may be fairly inferred from the fact that at the present time the legislative provisions of a majority of the states of this country on the subject of the competency of husband and wife as witnesses for and against each other more nearly resemble in this particular the new statute than the old one. "Generally these statutes [the American statutes on the subject] exclude 'communications' made between the husband and wife during marriage, although in a few the language of the statute is 'confidential communications' or 'private communications.'" Jones Ev., *s.* 763; Rap. Wit., *c.* 8. The whole subject is one as to which different views may be and are taken by different persons according as their tendencies are conservative or radical.

There are indeed strong practical reasons for making the exclusion absolute and not discretionary as respects communications between husband and wife. *Campbell* v. *Chace,* 12 R. I. 333; *Leppla* v. *Tribune Co.,* 35 Minn. 311. *Non constat* that Chief Justice *Sargent* and the other revisers of 1878, and the legislature which enacted the result of their labors, did not take the view of the matter expressed by the learned chief justice of Rhode Island. And if they did, who shall say that their view—a view embodied also in the legislation of so many other American states—was in any sense an unreasonable one? Of course it is possible that the revisers of 1878 may have made a sheer blunder and used language the force of which they did not at the time comprehend. In that case they have changed the law without meaning to do so; but the law is changed none the less. It seems inconceivable, however, that the three experienced and careful lawyers, — one of them a distinguished ex-chief justice, — who constituted the commission of 1878, could have been either careless or ignorant of the import of the language they used. Certainly, the presumption that they knew the meaning of words and the rules of grammar (*United States* v. *Goldenberg,* 168 U. S. 95)—a presumption universally applicable—is entitled to unusual weight in their case.

It is one of the most familiar canons of construction that " every word and clause should, if possible, have assigned to it a meaning, leaving no useless words." Bish. Wr. L., *s.* 82. " Statutes are to be so construed, if possible, as to give some effect to every clause, and not to place one portion in antagonism to another. A construction which leaves a sentence or clause of a statute no field of operation should be avoided, if any other reasonable construction

of the language can be given." *Lehman* v. *Robinson*, 59 Ala. 219. This presumption applies, of course, with peculiar force to the case of a revision, where conciseness of language is always one of the main objects sought to be attained.

Test the construction adopted in the opinion by applying this rule. The law as it stood at the time of the revision of 1878 was as follows : " The wife may testify for or against the husband or the husband for or against the wife in any case, when it appears to the court that their examination as witnesses upon the points to which their testimony is offered would not lead to a violation of marital confidence. " The revised law is as follows : " Sect. 20. A husband and wife are competent witnesses for or against each other, whether joined as parties or not, in all cases both civil and criminal. Sect. 21. The preceding section shall not be so construed as to render competent the testimony of a husband or wife for or against each other as to any statement, conversation, letter, or other communication made by either of them to the other or to any other person ; nor as to other matters when it appears to the court that the examination of either as a witness in relation thereto would lead to a violation of marital confidence. "

Now if the revisers did not intend to change the law, why did they not leave it as it stood, adding, if they deemed it desirable for greater clearness, after the words " in any case," the words " whether joined as parties or not, in all cases both civil and criminal " ? Or, if it seemed desirable to split up the statute into two sections, why did they not make section 21 read as follows : " The preceding section shall not be so construed as to render competent the testimony of a husband or wife for or against each other as to any matter when it appears to the court that the examination of either as a witness in relation thereto would lead to a violation of marital confidence " ? Unless they intended to designate two classes of testimony, — one absolutely incompetent, the other conditionally so, — why did they insert the words " as to any statement, conversation, letter, or other communication made by either of them to the other or to any other person," apparently designating thereby an absolutely excluded class, and then bring into sharp contradistinction a conditionally excluded class by introducing the second member of the clause with the words " nor as to other matters " ?

If the construction adopted by the court is correct, the words of section 21, " as to any statement, conversation, letter, or other communication made by either of them to the other or to any other person, " are mere surplusage. Some support for this construction may be sought to be drawn from the presumption which sometimes arises, in the case of a revision, that the revised statute was intended to have the same construction as the prior one.

(1) This presumption only arises where the language of the revised statute is ambiguous, which is not this case. *Drew* v. *Streeter*, 137 Mass. 460; *Bent* v. *Hubbardston*, 138 Mass. 99; Bish. Wr. L., *s.* 98. It was the intention of the commissioners, as stated by them, to express in the text of the revision the existing laws according to their understanding of them, in such a manner that no existing rights should be changed. Com'rs' Rep. G. L. 3. When there is substantial doubt as to the meaning of the language used in the General Laws, the statutes as they previously existed afford, therefore, a most valuable guide in their construction. But when language is clear, we cannot look to the earlier statutes to see if an error has been made by the legislature in its understanding of them, as there is then no room for the office of construction. The presumption that no change of meaning is intended is obviously much stronger where commissioners only undertake to embody in a revised and improved form the substance of the old law (*Bent* v. *Hubbardston, supra*) than it is where they undertake to make material changes, as in the case of the revision of 1878. See preface to General Laws, *pp.* vi, vii.

(2) The presumption that no change of meaning is intended in a revision applies only where the alterations are merely of form and not of substance — modifications of phraseology, and ordinarily by way of condensation. *Collins* v. *Millen*, 57 Ohio St. 289; *Ash* v. *Ash*, 9 Ohio St. 387; *St. George* v. *Rockland*, 89 Me. 43; *Westfield Cemetery Ass'n* v. *Danielson*, 62 Conn. 319; *Duffield* v. *Pike*, 71 Conn. 521; *McDonald* v. *Hovey*, 110 U. S. 619; *The Brothers*, 10 Ben. 400; *The E. W. Gorgas*, 10 Ben. 460; *Mooers* v. *Bunker*, 29 N. H. 420; *Burnham* v. *Stevens*, 33 N. H. 247.

As to the suggestion that there has been a contemporaneous construction of the statute, consisting in a failure heretofore to bring before the court for adjudication the question raised in this case, it is sufficient to say that if the meaning of the statute is plain on its face, as we claim it is, there is no occasion to resort to contemporaneous construction. But if it were a case where such aid might properly be resorted to, it seems very clear to us that the mere negative fact, that testimony which would be incompetent under the construction of the statute for which we contend has often been admitted *sub silentio*, cannot amount to a contemporaneous construction determinate enough to be entitled to the slightest weight. Besides, the period which has elapsed since the enactment of this statute has been much too short to allow a professional usage to develop to which the force of a contemporaneous construction can properly be accorded. See the remarks of Lord *Watson* in *Clyde Trustees* v. *Laird*, L. R. 8 App. Cas. 873.

PARSONS, J. " Husband and wife are competent witnesses for or against each other in all cases civil and criminal, except that neither shall be allowed to testify as to any statement, conversation, letter, or other communication made to the other or to another person, nor as to any matter which in the opinion of the court would lead to a violation of marital confidence." P. S., c. 224, s. 20. The plaintiff's husband was permitted to testify to conversations between the plaintiff and the deceased; but we do not understand it to be claimed that the testimony admitted involved any violation of marital confidence. The question, therefore, is whether the clause in relation to marital confidence, limiting the words "any matter," does or does not limit the preceding subjects of testimony, — statement, conversation, letter, or other communication made to the other or any third person; whether testimony as to the subjects of testimony specially named is absolutely excluded, and other matters only when the subject-matter is such as to lead to a violation of marital confidence; or whether the whole clause is an enumeration of subject-matters most likely to lead to such violation, for the purpose of calling particular attention thereto, followed by a general term including the matters named and all others.

This section is condensed from two sections in the General Laws; and it is conceded the verbal change made no change in meaning, and that the same effect must be given to its language as to sections 20 and 21, chapter 228, of the General Laws, in which the general right to testify is given in the first section cited and the limitation expressed in the following section. The first section, by reason of intervening amendments enlarging the competency of husband and wife, as witnesses for or against each other, is materially different from the corresponding section in the General Statutes of 1867; but the limitation of the right which was given by that section is expressed in the same words in the General Statutes and in the General Laws. In other words, section 21, chapter 228, of the General Laws is identical with section 21, chapter 209, of the General Statutes. It is therefore evident that our inquiry must address itself to the question, what was the meaning of this section when enacted in the General Statutes?

To understand the language used upon any occasion, no rule is more elementary than that we must put ourselves as far as may be in the situation of those using it. "As the same word or series of words may convey very different meanings, according to the circumstances under which they are used or the subject-matter to which they apply, the situation of the parties, their general purpose in the transaction, and all apparent circumstances connected

therewith, are competent evidence of the intention expressed by particular words and phrases in the contract. *Nettleton* v. *Billings*, 13 N. H. 446. Language, independent of the subject-matter or the author's general purpose, is usually meaningless and obscure. The inconvenience, hardship, or absurdity which one construction would lead to is often strong evidence in favor of another or different construction involving no objections of that character, because men in general do not enter freely into contracts which are absurd or frivolous, and therefore the knowledge of the court on that subject is evidence of the intention of the parties." *Kendall* v. *Green*, 67 N. H. 557, 562, 563. The instrument to be interpreted, whatever may be its nature, should be read in the light of all the circumstances which may be supposed to have been present to the mind of its author when it was framed.

Previous to the enactment of the General Statutes in 1867, it was held in numerous cases that the act of 1857 (*c.* 1952) rendering witnesses competent regardless of their interest in the controversy did not affect the competency of husband and wife as witnesses for or against each other. This was held upon the ground that such disqualification was based upon public policy as well as upon interest, and that, while the latter objection to their competency as witnesses was withdrawn by force of the statute, the former was unaffected. *Kelly* v. *Proctor*, 41 N. H. 139; *Breed* v. *Gove*, 41 N. H. 452. In *Smith* v. *Railroad*, 44 N. H. 325, 334, where the question again arose, *Bellows*, J., after referring with approval to the cases cited, said: "The rule, then, is founded upon enlightened views of public policy, which regard as of vital importance the preservation of domestic peace and harmony, and the promotion of the unreserved confidence between the husband and wife which the sanctities of that relation require. . . . Without stopping, then, to inquire whether, in a given case, the admission of the husband or wife to testify would in fact be attended with the mischiefs described, such as the violation of conjugal confidence, the law has laid it down as a general principle, that they cannot testify for or against each other." In that case, a suit by husband and wife upon a cause of action accruing to the wife before marriage, the want of logic and the injustice of excluding the testimony of the wife because of possible "violation of conjugal confidence" is especially apparent. Hence the court were careful to put the decision upon a rule applicable to all cases, which did not permit inquiry whether the reason for it existed in the particular case. Thus, despite the removal of the disqualification of interest, husband and wife were still refused as witnesses in any case to which the other was a party, even when it was clear their testimony would not tend to violate the mutual confidence attached.

to the marital relation, and its admission could not for that reason be said to be against public policy. This view was adhered to in *Young* v. *Gilman*, 46 N. H. 484 (1866). At the same time the surviving wife was permitted to testify as to matters in which her deceased husband was interested, unless she acquired her knowledge of the facts through confidential communications from her husband. *Jackson* v. *Barron*, 37 N. H. 494; *Ryan* v. *Follansbee*, 47 N. H. 100. The objection to the testimony of husband or wife for or against each other was understood to rest upon the danger of the violation of conjugal confidence,—the disclosure of confidential communications from the one to the other. Although it was perceived that there were cases in which the reason for such exclusion was wanting, the rule itself was considered too well settled for judicial abrogation.

In this situation, in 1866 a husband and wife were, by legislative action (Laws 1866, c. 4268), made competent witnesses for or against each other, whether joined as parties or not, in three classes of cases: First, in actions upon policies of insurance so far as relates to the amount and value of the property insured; second, in actions against carriers so far as relates to the loss, amount, or value of property which is subject to the suit; third, in actions in which the subject-matter of the controversy happened or accrued before marriage. Section 2 of the act provided that "nothing in this act contained shall be so construed as to render competent the testimony of a husband and wife for or against each other, as to any statements, conversations, letters, or other communications between them, or between either of them and any third person." The case of *Smith* v. *Railroad*, 44 N. H. 325, before cited, was covered by two of the classes named, as it was for goods alleged to have been lost by a common carrier and was upon a cause of action accruing to the wife before marriage. This fact, with the apparent purpose of the second section to prevent violation of what had been assigned as the reason of the rule of public policy, establishes that the legislative action was taken in view of and with direct reference to the course of judicial decision upon the question.

This act was reported in the legislature by a member of the commission which had already been appointed under the act of 1865 to prepare the revision known as the General Statutes. This action resulted from the passage of a resolution by the house of representatives, directing the judiciary committee to inquire into the expediency of amending the laws relating to the admissibility of parties as witnesses so as to allow husband and wife to testify for or against each other. House Journal, 1866, *p.* 222. The act of 1866 was approved July 7, and went into effect upon its pas-

sage. It was not made applicable to pending suits, and, in the natural course of events, could not have been extensively applied in practice, if at all, before the report of the commission upon the General Statutes was filed in April, 1867. *Rich* v. *Flanders*, 39 N. H. 304; *Glines* v. *Smith*, 48 N. H. 259, 272. Hence it must be that the changes which were made by the commission were not amendments, the necessity of which had been shown by the practical working of the act, but were in the nature of a redraft, upon mature consideration, to express more clearly the original purpose. The original act was an attempt to cure the difficulty; but though it confined the injustice of the rule within narrower limits, the act was nearly as illogical as the ruling of the court. The cases enumerated are not all the actions in which husband and wife might testify without violation of conjugal confidence, nor is it true that testimony as to statements, etc., between each other and a third person would of necessity encroach upon the sanctity of the marital relation. The wrong intended to be cured was the exclusion of competent testimony for a reason that did not exist in the particular case. The logical solution of the trouble would seem to have been to provide for the exclusion of the testimony in cases where the reason urged against it did in fact exist, and its admission in other cases. The act of 1866 was a tentative effort at a remedy; but upon consideration it is evident, and it must have so appeared to the commission, that the exclusion of statements, etc., was both too broad and too narrow. A married person might testify to statements of the character described without violation of marital confidence. Such is the character of the testimony in the present case. It was so understood in *Ryan* v. *Follansbee*, 47 N. H. 100 (1866). Since testimony as to such statements does not necessarily, and testimony as to other matters may, violate marital confidence, the original act was clearly imperfect. In this situation the commission reported the first section of the act of 1866 as section 20, chapter 209, of the General Statutes, without material change so far as the present question is concerned. They materially changed section 2 of the act of 1866, which is section 21, chapter 209, of the General Statutes, and added a new section, — section 22. These sections are as follows: "Sect. 21. The preceding section shall not be so construed as to render competent the testimony of a husband or wife for or against each other as to any statement, conversation, letter, or other communication made by either of them to the other or to any other person; nor as to other matters when it appears to the court that the examination of either as a witness in relation thereto would lead to a violation of marital confidence. Sect. 22. The wife may testify for the husband or the husband for the wife in any case, when it appears

to the court that their examination as witnesses upon the points to which their testimony is offered would not lead to such violation of confidence." While the punctuation found in the printed volume supports the view that the limiting clause in section 21 applies only to the last subject referred to, " other matters," and does not affect the previous subjects, " statements," etc., it is not conclusive as to the meaning of the section. The two sections (21 and 22), taken together, indicate that the disclosure of marital confidence was understood to be the point to be guarded against in the admission of husband and wife to testify. The legislature understood that testimony which did not have that effect should be admitted. Rejecting the punctuation, the natural and ordinary inference to be drawn from section 21 is that the limiting clause as to violation of marital confidence applies to each variety of testimony before enumerated,— a view which is strengthened by the fact that, so read, the addition made by the commission is a logical and reasonable correction of a well-understood existing evil. Where the exception in the act of 1866 was too broad it is corrected, as well as wherein it was too narrow. The admission and rejection of the testimony is put upon the real ground and upon the same ground as in the following section, wherein it is provided that the testimony of either for the other may be admitted in all cases. But it is said that when the clause excluding statements, etc., first appeared in the statute in 1866, it was without limitation of any kind ; that the added clause purports to be a limitation and not an extension ; that testimony as to conversations, etc., was finally disposed of by the provision that it should not be admitted ; and that a subsequent provision, that any testimony that violated a certain rule should be excluded, falls far short of a provision that all testimony that does not violate such rule is admissible. There is great force to this contention as an abstract proposition. We do not think, however, that it can determine the question of legislative intent, in view of the history of judicial decision upon the admissibility of such testimony, and the purpose and object of the change made by the acts of 1866 and 1867, which are, in effect, one effort to draft a statute to meet the situation. This argument gives no weight to section 22, which, as part of the same law, should aid in ascertaining the legislative purpose. It is true that upon the view that the limiting clause of section 20 was understood to apply to all the subjects of testimony enumerated, the early part of the section might have been omitted. But it is equally true that upon the adoption of section 22 all of sections 20 and 21 relating to the testimony of husband and wife for each other might have been stricken out. The form adopted is not unusual—an enumeration of particulars followed by a general clause embracing the

whole.   Conversations were suspected as likely to provoke testi-
mony leading to a violation of marital confidence, and from excess.
of caution the words were left to call attention to that possibility.
The opposite construction is contradicted by the following sec-
tion.   If section 21 must be read to mean that the husband or
wife cannot testify for each other in the four kinds of actions.
enumerated in section 20, as to any conversation, statement, etc.,
whether a violation of marital confidence is involved or not, then
such provision is directly opposed by section 22, which provides.
that they may testify for each other in any case when it appears.
that such testimony would not lead to a violation of marital confi--
dence.   It is not to be presumed that the legislature intended con--
tradictory provisions in two consecutive sections.   The application
of the limiting clause in section 21 to all that precedes is the only
construction that can be given to the two sections that will render·
them harmonious with each other.   If this had not been understood
to have been the meaning, so much of section 20 as relates to the.
testimony of the husband or wife for each other would have been
stricken out, and the section left solely to the definition of the.
cases in which they were competent witnesses against each other..
While if this had been done the law as to the testimony of either·
for the other would not have been affected, the fact that it was not.
done is evidence of great weight that it was understood no conflict
existed.   The conclusion reached in the light of the history of:
judicial decision, the recognized wrong to be remedied, and the
situation when the law was passed, is fairly deducible from the
language used.   We can reach no other result except by the appli-
cation of a narrow construction which we are not at liberty to apply
to a remedial statute.   We conclude, therefore, that in 1867 the
limitation of a violation of marital confidence applied to "state-
ments, conversations," etc., as well as to "other matters."   Testi-
mony upon all the subjects enumerated was admissible if it did
not tend to such violation,—inadmissible if it did.   If this view is,
sound, the testimony objected to in this case is competent under
the similar language in the Public Statutes.

Whatever view is taken of the meaning of sections 20 and 21,.
chapter 228, of the General Laws, it must be admitted that the
testimony of the husband for the wife which we are today asked
to exclude was beyond question competent in 1867, under section
22, chapter 209, of the General Statutes.   It is conceded that the.
general direction has been onward; that the door for the admission.
of truth has been opened wider year by year.   But we are now
asked to go backward thirty-two years against the tide of progress.
in the law of evidence for the last forty years and adopt an illogi--
cal rule, utterly unsupported by reason, upon the ground that.

the meaning of the language used in the General Laws (c. 228, ss. 20, 21) is so clear that no other meaning can be attributed to the words used, despite the fact that it does not appear that during all the time since 1878 any person ever attributed such meaning to the language.

It is clear that only a sense of absolute certainty, a conviction that there is no possible ground for an opposite conclusion, alone could allow us as a court by judicial construction to declare that the legislature deliberately adopted such a rule. The policy of the legislature has been uniformly to remove restrictions placed by the common law upon the competency of witnesses and testimony. *Page* v. *Whidden*, 59 N. H. 507, 511; *Peirce* v. *Burroughs*, 59 N. H. 512, and authorities cited. The ancient disabilities pertaining to the marriage relation have also been removed from time to time, until now husband and wife stand upon an equality of right in respect to property, torts, and contracts, subject only to minor exceptions in favor of the wife. *Laton* v. *Balcom*, 64 N. H. 92, 95; *Seaver* v. *Adams*, 66 N. H. 142. It would be strange indeed if a legislature should set itself against the strong forces of civilization that have produced such changes, and restore disabilities of this character once removed. That there was an intent to do this in this instance cannot be credited, in the absence of language that is incapable of other construction. The liberty given by the General Statutes was still further extended by subsequent legislation (Laws 1870, c. 20; Laws 1871, c. 38, s. 2), so that prior to the General Laws husband and wife were competent witnesses for or against each other in all matters, both civil and criminal, where no violation of marital confidence was involved. *Clements* v. *Marston*, 52 N. H. 31. As already stated, in this revision (1878) section 20, chapter 209, of the General Statutes, becomes section 20, chapter 228, of the General Laws, modified in consequence of legislation subsequent to the General Statutes by the addition of the words "in all cases both civil and criminal," and the omission of the enumeration of certain classes of actions in which, under the previous statute, husband and wife were made competent witnesses for or against each other. After the broad terms of section 20, chapter 228, of the General Laws, amended by Laws 1870, chapter 20, follows the limiting section in the exact language used in the General Statutes. Whatever is the correct view as to the meaning of this language in 1867, the question is: what did the legislature mean by it in 1878? *State* v. *Williams*, 68 N. H. 449, 451. An important consideration tending to show that the legislature in 1878 understood this section meant what it has been said it meant in 1867, whether the view taken of its meaning at that time is or is not correct, is found in the fact

that, giving to this section the meaning already assigned, applying the provision as to violation of marital confidence to "statements," etc., as well as to "other matters," the statute means exactly what the law had been made by the amending acts and declared by the court in *Clements* v. *Marston, supra.* Changes of phraseology made in a revision are not to be construed as changing the law previously settled by plain statutory provisions or judicial decision, unless it is clear such was the intention. *Cocheco Mfg. Co.* v. *Strafford*, 51 N. H. 455, 471; *Jewell* v. *Holderness*, 41 N. H. 161, 163; *Burnham* v. *Stevens*, 33 N. H. 247, 256; *Crowell* v. *Clough*, 23 N. H. 207, 210; *McDonald* v. *Hovey*, 110 U. S. 619, 629. "So upon a revision of statutes a different interpretation is not to be given to them without some substantial change of phraseology — some change other than may have been necessary to abbreviate the form of the law." Sedg. Con. Stat. 365; *McDonald* v. *Hovey, supra; Mooers* v. *Bunker*, 29 N. H. 420. The General Laws were intended to be a compilation merely and not a revision. Laws 1877, *c.* 33, *s.* 2; *Ib.*, *c.* 74, *s.* 2; *Ib.*, *c.* 115, *s.* 1. Com'rs' Rep. G. L., *p.* 1. While the commission departed somewhat from the original intention, they state in their report that they have marked radical changes "new." There is no indication by marginal reference or otherwise that any change was understood to have been made upon the point under consideration.

It is now twenty years since the adoption of the General Laws. During that time husband and wife have testified for and against each other before juries, referees, and judges almost daily, and no limitation upon the right has ever before been suggested except that of marital confidence. The question might well be disposed of as settled by general acquiescence. See *Sargent* v. *Gilford*, 66 N. H. 543, 544. Giving due weight to all the competent evidence tending to show the legislative understanding of the words used — the legislative intent, and balancing that against the evidence furnished by a critical analysis of the words themselves, we think it more probable the legislature did not intend in enacting the General Laws to change the law as it had stood since 1870, but understood and intended that the only limitation upon the competency of husband and wife as witnesses for or against each other should be the violation of marital confidence, and that such intent is fairly expressed by the language used, read in the light of all the facts competent for our consideration. So finding, it is our duty to so declare the legislative intent. A slavish adherence to the letter when the contrary meaning is obvious is not interpretation. True interpretation is "not of the letter, but of the spirit; for the letter killeth while the spirit giveth life."

*Exception overruled.*

BLODGETT, C. J., did not sit: the others concurred.